[Civ. No. 8511.   Third Dist.   Dec. 14, 1954.]

ERNEST C. SEVENMAN, as Administrator, etc., Appellant, v. LONG BELL LUMBER COMPANY et al., Defendants; SUGAR CREEK PINE COMPANY (a Corporation), Respondent.

Barr & Hammond, Harry A. Hammond and Richard Stevens for Appellant.

Floyd Merrill and Ellis Filene for Respondent.

VAN DYKE, P. J.—Appellant Sevenman, as administrator of the estate of Flora M. Sevenman, deceased, brought this action against Sugar Creek Pine Company, a corporation, respondent herein.

The complaint simply alleged that in his capacity as administrator plaintiff was entitled to the possession of a described tract of land, and that the defendants claimed some right or interest therein when in fact they had none. The answer of respondent denied generally the allegations of the complaint. It also contained affirmative defenses. By the first of these it asserted that the real property mentioned had at the date of the death of Flora Sevenman been the community property of herself and her husband, H. M. Sevenman; that she died intestate in July, 1939; that he survived her and thus acquired

the entire interest in the property and that on October 5, 1944, he conveyed the property to respondent. It may be said now that there is in this appeal no contention that this defense was made out in that it is agreed from the record that the property was the separate property of Flora Sevenman and, therefore, that by her death her husband took a one-third interest in the property, the other two-thirds being severally vested by reason of the same death in his son, Ernest, who herein appears as administrator of his mother's estate, and his daughter Mary, a sister of appellant. By other affirmative defenses respondent pleaded the statute of limitations limiting to five years the right of one who has been ousted from possession of real property and whose property has been held by adverse possession to assert title. By cross-complaint couched in the usual terms respondent asserted its own ownership of the property in controversy and sought to have its title quieted against the claims of appellant. After trial the court upheld respondent's claims under the statute of limitations, holding that respondent had, since 1944, been in the actual, open and notorious possession under color of title and had, during that period, paid all taxes assessed and exercised complete dominion over the property; that the recordation of the deed from H. M. Sevenman to respondent, together with other acts of respondent in connection with the property had put appellant and those for whom he claimed on notice and that they had lost all title to the property by the adverse possession of respondent. Judgment was entered quieting title of respondent as fee simple owner of the property.

The only issue presented by the appeal is as to the sufficiency of the evidence to support the findings of the trial court relating to adverse possession. In addition to what has been said the testimony shows the following: Flora Sevenman died intestate July 29, 1939, she owned the property in severalty. On October 5, 1944, by deed recorded October 10th following Sevenman quitclaimed the property to respondent. In material part this deed read as follows:

"In consideration of Ten Dollars . . . receipt of which is hereby acknowledged, I, H. M. Sevenman, surviving spouse of Flora M. Sevenman, Deceased, does hereby quitclaim to Sugar Creek Pine Co., a corporation . . ." the subject property.

The description in the deed was a proper legal description. Appellant at the trial proved title of record in his decedent

and rested. Respondent then called two witnesses and their testimony completes the record. The Siskiyou county auditor testified that all the taxes on the property had been paid. It was shown that the taxes had been paid by respondent. It does not appear how the land was assessed. The other witness, Roy E. Mason, testified as follows: From January 1, 1943, until July 1, 1950, he was the manager of sawmill operations for respondent in Siskiyou County; the subject property had never been used for any purpose other than as prospective timber land; there might possibly have been some mineral prospecting done on it; Mason visited the property on foot and on horseback at various times during the 1944-1950 period, checking the boundaries, cruising the timber, checking against possible trespassings and threats of fire; he had advised various strangers to the title that respondent owned the property; nothing had been done on the property, that is, in any way putting it to use, from 1945. The foregoing was Mason's direct testimony. On cross-examination the following was elicited: With respect to the year October 5, 1944, to October 5, 1945, he visited the property two times on horseback and several times on foot; altogether that year he spent not to exceed one full day on the property and during his visits his entire work consisted of finding some survey marks, walking through the timber and locating some of the boundary lines. He did not visit the property in 1946 and so far as he knew no employee of respondent did so. In 1947 he visited the property twice during the summer, once with a Mr. Lewis, to whom he pointed out a section corner establishing the line between the Lewis property and the subject property, and once later in the season when he returned to see if there was any trespassing going on. Nothing further occurred in 1947, but in 1948 he visited the property once, at a time when there was a fire in the general vicinity which was out of control. It was across a canyon from the subject property. He had made no clearings around the property for its protection and on that visit he spent about three hours on the land, which time was consumed traveling to the property and across it to an observation point and then returning to the road. On the land itself he spent about an hour. In 1949 he visited the property four times to see if a Mr. Munson who was cutting timber in the vicinity was trespassing. During that year he spent about five hours on the property. While there he endeavored to locate the boundary line but did nothing more at that time. On his second visit he spent about

two hours on the land, during which he checked the south line to detect trespassing. He spent an hour on the third visit and about the same on the fourth during that year. These visits all involved checking to see if Mr. Munson had trespassed and cut timber. He did not visit the property in 1950. A Mr. McDonald Smith had cruised the property during this period for the respondent. He made a rather lengthy technical survey of the standing timber and when necessary made survey lines and marked the boundary. He and his surveying crew were in there two or three days. Respondent owned property to the west and to the east of the subject property. The property had been ''set up on its books'' as being owned by respondent.

The sole issue presented by this appeal is whether or not the evidence supports the court's finding of adverse possession. We will discuss this issue first without regard to the fact that the deed of decedent's surviving husband conveyed no more to respondent than an undivided one-third interest in the subject property and made respondent a cotenant with the other heirs. Adversely a title as against a cotenant is acquired, if at all, ''by acts of the same character as will produce any other ouster. In either case it is the 'wrongful dispossession or exclusion of a party from real property who is entitled to the possession.' In each case the same kind of possession is required, and it must be taken and held with the same hostile intent.'' (*Winterburn* v. *Chambers,* 91 Cal. 170, 180 [27 P. 658].)

It must be said that the evidence of adverse possession presented by this record is unusually and exceedingly weak. There was little, if anything, in the way of actual possession by anyone over the course of five or six years which the evidence covered. An employee of respondent occasionally went upon the land, once upon a tractor in order to reach a certain point for observation purposes, twice on horseback and several times on foot. Altogether the acts of occupancy and use shown to have been done by respondent through its employees would scarcely add up to one day in each year as an average and during at least more than one year no such acts occurred. If the other heirs of decedent, her son and daughter, had exercised acts of possession and use on their part one hundred fold greater than those exercised by respondent they might never have contacted anyone exercising any possession of the land for respondent nor discovered traces of such acts

upon the surface of the ground. Respondent seeks to strengthen this obvious weakness of evidence of adverse possession by pointing out that the testimony showed the land to be so steep and irregular and of such poor productivity as to make its only use that of the growth and timely harvesting of timber. ▮ But the fact that land can be put to little use or perhaps is scarcely usable at all does not excuse one claiming to have adversely possessed the same from exercising such acts of possession and control as would constitute some notice to the world and to the legal owner of his hostile conduct. Such a situation may make it difficult for one to seize and possess the lands of another and ultimately to take his title, but the adverse claimant is hardly in any position to assert injury resulting from the hardship. In *Saecker* v. *Cohn,* 180 Cal. 151 [179 P. 890], evidence of adverse possession was held insufficient to support a finding thereof in the following situation: Claiming under a void tax deed respondent had leased land in Kern County for grazing purposes, which use was shown to be the only use of which the land was capable. This use, however, of the unenclosed land, which was surrounded by open country, was held insufficient to establish adverse possession where the lessee pastured sheep and cattle over that land and other land a few days in the spring and a few days in the fall of each year at irregular annual intervals. Said the court, at page 156:

". . . It thus appears that he had sheep on the land in the fall of 1908, and that there was no use whatever of the land thereafter until the fall of 1909, nor during the time from the spring of 1911 until the spring of 1912. On two occasions, therefore, during the five years period next before the beginning of the action, there was an interval of an entire year when the land was wholly unoccupied by the tenant of Cohn. Furthermore, in the present case there is no proof that during the long intervals when the Land Company was not pasturing the land other people were not occupying the same. Such occupancy is wholly insufficient to constitute that open, continuous, and notorious adverse possession which is necessary to give notice to the owner thereof that some other person is claiming his land. There is no evidence that the plaintiff and his predecessors in interest had any knowledge whatever of the use or occupation of the Land Company, or of the claim of Cohn. The proof was substantially the same as that considered in *De Frieze* v. *Quint,* 94 Cal. 653, 660, [30 P. 1, 28

Am.St.Rep. 151], and which the court there held was insufficient to prove adverse possession. The court there said that to set the statute of limitations in motion and constitute adverse possession the occupancy of the land 'must be sufficiently open and notorious to notify an ordinarily prudent owner of its existence, and of its hostile character, unless he is otherwise *actually* notified of these facts; . . .''

■ Since the adverse character of occupation and use in a case where the occupier has pleaded the statute of limitations against the legal title is ordinarily a question of fact to be resolved by the trial court and since in such a case the conclusions of the trier of fact are entitled to every inference of validity and sufficiency, we think it appropriate that we now discuss this same evidence in the light of the actual title which was conveyed to it by respondent's predecessors in interest. The record of the title ended with the ownership of Flora Sevenman. There was no evidence that her estate had been probated or that her heirs had been ascertained by any sort of judicial proceeding, and, in the absence of such evidence, we must assume that no such proceeding had ever been taken until the appointment of appellant as administrator of her estate. When she died, however, her title descended to and vested in her heirs, which the record shows were her surviving husband and her two children. ■ Such was the situation when respondent purchased and it had constructive notice that the surviving husband from whom it bought had no record title. It is significant then that it did not take from him a grant deed, but took only a quitclaim and that in this document he was described as being the surviving husband of his predeceased wife. The quitclaim deed was sufficient to convey to respondent such title as the surviving husband had, but the use of the form and the use of the description of the capacity in which the surviving husband was conveying his interest show clearly that respondent understood it was purchasing only the interest of an heir of appellant's decedent. There is nothing on the face of the instrument to indicate that there were not other heirs and for aught that appears respondent knew that there were. Respondent asserts that the descriptive words were *descriptio personae* only and have no significance. We do not agree. We think the deed can only be construed from its face as one whereby an heir of a decedent described as the surviving spouse conveys and purports to convey only such interest as the death of his wife caused to be vested in him as an heir.

The entry of respondent upon the land, therefore, could not come under the rule that:

"If a cotenant makes a conveyance which purports to convey not merely his undivided interest in the land, but the entire interest therein, . . . and the grantee in the conveyance takes possession accordingly, without any recognition of the rights of the other cotenant, out of possession, the possession of the grantee is regarded as adverse to the latter, and the latter is charged with notice to this effect." (Tiffany on Real Property, vol. 4, 3d ed., § 1185, p. 533.)

██ On the contrary, the entry and the acts of possession of respondent under the deed which it took and recorded falls within the rule that in order for a cotenant to initiate and maintain adverse possession to the common property he must exercise acts of ownership of such an unequivocal character, so overt and notorious and of such nature, as by their own import to impart information and notice to his cotenants that an adverse possession and disseisin are intended against them. (Tiffany on Real Property, § 1185, p. 526.) Says the author:

". . . As between cotenants, the fact that A is in possession, or takes all the rents and profits, while B is not in possession and receives none of the rents and profits, is not of itself sufficient to start the running of the statute in favor of A. B has a right to assume that A holds possession, or otherwise utilizes the property, with a full recognition of the right of B to do the same if he so chooses, and B is guilty of no laches in failing to assert his rights."

Even if respondent had started cutting the timber on the subject property and the fact had been brought to the notice, actual or constructive, of the cotenants they could not have stopped the harvesting of the timber if, in point of fact, it was ripe and ready for harvest and in the exercise of good husbandry ought to be harvested. They could join in the activity and in the disposition of the cut timber and share in the expenses and income therefrom, but they could not prevent such proper use to which alone, according to this record, the property could be put. It may equally be said that if they had had actual knowledge of those things which respondent did in fact do they could not have prevented them in any way nor had a right of action to enjoin, or otherwise interfere with, such use and occupancy of the property by respondent.

██ We conclude that whatever may be said as to the sufficiency of those things done by respondent to initiate and com-

plete adverse holding as against a stranger its acts were totally insufficient to constitute such adverse possession as against its cotenants.

The judgment appealed from is reversed.

Peek, J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 10, 1955.